

NUMBER 13-10-00534-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**DAVID FRANCISCO BARRON,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

### On appeal from the 377th District Court
### of Victoria County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Memorandum Opinion by Justice Garza**

A jury found appellant, David Francisco Barron, guilty of aggravated robbery, a first-degree felony, with an affirmative deadly-weapon finding, *see* TEX. PENAL CODE ANN. § 29.03(a)(2), (b) (West 2003), and capital murder, a capital felony, with an affirmative deadly-weapon finding. *See id.* § 19.03(a)(2), (b) (West Supp. 2010). The jury sentenced him to life imprisonment for the aggravated robbery, *see id.* § 12.32

(West 2003), and the trial court sentenced him to life imprisonment without parole for the capital murder, *see id.* § 12.31(a)(2) (West Supp. 2010), with the sentences ordered to run concurrently. By a single issue, appellant contends the evidence was insufficient to support his conviction for capital murder.[1] We affirm.

## I. BACKGROUND

Appellant and his co-defendant, Marcus Pena, were tried together for the murder of Jason Garcia. The jury found both guilty of aggravated robbery and capital murder. In the early morning hours of August 23, 2009, Garcia called appellant and asked for a ride home from La Caliente, a nightclub in Victoria, Texas. Appellant was accompanied by Marcus, Antonio Castillo, and Rolando Pena.[2] The four men picked Garcia up. Earlier in the evening, appellant and Marcus had been in a fight with Andy Higdon, an acquaintance of Garcia's. Because Garcia had not joined in the earlier fight and did not provide Higdon's phone number or address to appellant and the others, they beat him repeatedly and left him in the parking lot of Magic Industries, a business located in Victoria. A summary of relevant trial testimony is presented below.

### A. State's Evidence

### 1. Leisha Wood

Leisha Wood, M.D., a medical examiner with the Travis County Medical Examiner's Office, testified that she conducted an autopsy on Garcia's body and prepared a report. Dr. Wood testified that Garcia had a broken nose, significant

---

[1] Appellant's brief states incorrectly that appellant was convicted of "capital murder and engaging in criminal activity (underlying offense aggravated robbery)" and asserts that "in both charges, capital murder and engaging in organized criminal activity, the State has failed to prove its case . . . ." The brief does not address appellant's conviction for aggravated robbery. Accordingly, we construe appellant's brief as challenging only the sufficiency of the evidence supporting his conviction for capital murder.

[2] Testimony at trial showed that Marcus Pena and Rolando Pena are cousins.

bruising, and numerous blunt-force injuries. Garcia had injuries on all sides of his face and scalp and swelling of his brain. His head was distended, an injury consistent with being kicked in the face. Garcia also had numerous "defensive-type injuries" on his arms, which were consistent with an attempt to protect himself.

On cross-examination by appellant's counsel, Dr. Wood stated that Garcia's injuries, by themselves, may not have caused his death. She clarified, however, that she thought that "the injuries did cause his death or at least contributed to his death." She further testified, "[h]is injuries caused his death. Maybe not the direct injuries themselves, without the heart condition or without the cocaine, maybe he could have survived—maybe he could have, but the temporal relationship between injury and his death, you can't exclude the injuries from his death." She stated that she could not "say for certain" whether Garcia would be alive if he had not had cocaine and marihuana in his system.

## 2. Eline Moya

Eline Moya, a sergeant with the Victoria Police Department, testified that she was the first officer to report to the scene where Garcia's body was found, around 2:15 a.m. Garcia was found face-down in the parking lot at Magic Industries; when Sergeant Moya checked, Garcia did not have a pulse. When EMS personnel arrived and rolled Garcia over, Sergeant Moya observed that Garcia had blood on his face and coming out of his ears.

## 3. Andy James Higdon

Andy Higdon testified that he had known Garcia for about a year or two and that they were "cool." He saw Garcia at the Club Westerner on the night Garcia was killed.

3

Garcia introduced Higdon to "a dude" as "my home guy, 'Lunatic,'" (Higdon's nickname). The "dude" responded to Higdon, "[y]ou're the one that has a problem with our home boy, Rico?" Then, Higdon "got hit." Security guards ushered Higdon and the others outside, where Higdon was again assaulted. Garcia did not participate in the fight. When Higdon asked Garcia why he had been assaulted, Garcia said he did not know. When the men who assaulted Higdon left, they shouted that they were members of the Mexican Mafia. Higdon testified that he does not belong to a gang.

**4. Lisa Pena**

Lisa Pena is married to Rolando and knows appellant, Marcus, and Castillo. Lisa and Rolando were at Club Westerner the night of the incident celebrating a quinceanera for Lisa's daughter. After the celebration ended about midnight, Lisa and Rolando went to the home of Lisa's parents for an after-party. Appellant, Marcus, and Castillo were also there. Around 2:00 a.m., Lisa's father asked them to leave because they were shouting in the yard. Appellant, Rolando, Marcus, and Castillo left in Lisa and Rolando's white Cadillac. At the same time, Eina Fernandez left in a separate car. Around 5:00 a.m., Eina picked Lisa up at her parents' house and drove her to Eina's house. Appellant, Marcus, and Rolando were there. Lisa went to Eina's to pick up Rolando and drive her car back to her parents' house; Rolando was too intoxicated to drive. Lisa testified that Rolando said he "got into some shit." Lisa stated that she thinks Rolando is a member of the Mexican Mafia. The morning after the quinceanera, Rolando, appellant, and Marcus went to Corpus Christi in Lisa's vehicle. Lisa contacted Rolando's aunt, who lived in Corpus Christi, and made arrangements for the men to stay at her house in Corpus Christi. Eina and Stephanie Rendon were at Lisa's house

4

when the men left.

## 5. Dustin Ferguson

Dustin Ferguson, a licensed paramedic, testified that he responded to the 911 call regarding Garcia's body. Garcia was found lying face down in the parking lot. Garcia had no pulse and did not respond to emergency measures.

## 6. Stephanie Rendon

Stephanie Rendon testified that at the time of the events at issue, she was appellant's girlfriend. In response to the State's questions, Rendon stated that she is under indictment for a felony offense and has an agreement with the State that in exchange for her truthful testimony, the charges against her could be dismissed. Rendon testified that through appellant, she knows Rolando, Marcus, and Castillo. She also knows Eina, Marcus's then-girlfriend, and Lisa. Rendon stated that she went to the quinceanera at Club Westerner with appellant. Marcus and Eina were with them. When the club closed around midnight, she and appellant, along with Marcus and Eina, Eina's daughter and her friend, and Garcia left together and went to Eina's house to drop off Eina's daughter and her friend. Then, Rendon and appellant, Marcus and Eina, and Garcia went to a club, La Caliente.

At La Caliente, Rendon saw Garcia introduce someone she knew by his nickname—"Lunatic"—to appellant and Marcus; a fight broke out between appellant, Marcus, and "Lunatic." She did not go outside right away and did not see fighting outside. When she went outside, she saw a guy shout "Sureno," which according to Rendon, is Spanish for "south." Rendon and Eina went to the car and picked up appellant and Marcus down the road. Garcia stayed at La Caliente.

5

Rendon said the four then went to the home of Lisa Pena's parents. Appellant and Marcus got out and talked to Rolando. Castillo was with Rolando. Appellant, Marcus, Rolando, and Castillo got into Rolando's vehicle, a white Cadillac, and left. Rendon and Eina followed the men in Eina's vehicle to another club, the Hideaway. Garcia got into Rolando's car at the Hideaway. Appellant told Rendon not to follow them, but she did. Rolando's vehicle stopped at Silver City,[3] and appellant, Marcus, Rolando, Castillo, and Garcia got out. Rendon saw Rolando assault Castillo. Appellant was driving; Rolando was in the front passenger seat. Marcus, Castillo, and Garcia were in the back seat with Garcia in the middle. Although somewhat unclear as to the sequence of events, Rendon said they went to the Hideaway first, then to Silver City. After appellant told Rendon to go home, she and Eina went to Eina's house.

Forty-five minutes to an hour later, appellant, Marcus, Rolando, and Castillo returned to Eina's house. Rendon saw that appellant and Marcus had blood on their hands and shirts. Appellant, Marcus, and Rolando changed clothes. Appellant asked Rendon and Eina to drive to Magic Industries, where they had left Garcia, and check on him. Rendon said she thought something had happened to Garcia, but did not ask for an explanation. Rendon and Eina drove to Magic Industries. When they did not see Garcia, they called appellant, who told them to pick him up. They drove to Eina's, picked appellant up, and drove back to Magic Industries. Appellant pointed out where Garcia's body was. They then drove back to Eina's, dropped off appellant, and drove back to Magic Industries.

Rendon said that as she stood over Garcia's body, there was a "pile of blood

---

[3] Although not otherwise described in the record, Silver City is apparently a nearby neighborhood or community.

underneath him" and she was afraid to touch his body. She called 911, using Eina's phone. She believed that Garcia was dead. Rendon told the 911 dispatcher that they were driving by and saw a body and did not know if the victim was alive. They did not wait for the ambulance, and went back to Eina's house.

While they were gone, Castillo had left. Appellant, Marcus, and Rolando asked Rendon and Eina what they had seen. Rendon and Eina said that Garcia was lying face down in a pool of blood and was not breathing. Rendon remembered being interviewed by the police and recalled that the men told her they had beaten Garcia up and may have hit him too hard. Rendon said she did not tell the officers the complete truth before because she was scared. Rendon said that she saw some of Garcia's property with appellant, Marcus, and Rolando; she saw Garcia's hat, telephone, and wallet. The men burned Garcia's belongings in a barbeque pit at Eina's sometime between 4:00 and 5:00 a.m. Rolando went home when Lisa came to pick him up.

The next day, Rendon, appellant, Marcus, and Eina went to Lisa's house. Appellant, Marcus, and Rolando left town in Rolando's white Cadillac. Appellant later called Rendon and asked if the police had contacted her.

**7. Ileina Fernandez**

Ileina "Eina" Fernandez is married to Marcus and at the time of trial was filing for divorce. Prior to Garcia's murder, she had known appellant for a few weeks. Eina testified that Marcus and appellant are members of the Mexican Mafia. On the night of Garcia's murder, Eina attended the quinceanera at the Club Westerner with Marcus, appellant, Rendon, and Eina's daughter. They left the Club Westerner about the time it closed. When they left, Garcia was with them. They dropped Eina's daughter off at

home and went to La Caliente around 1:00 a.m.

At La Caliente, appellant and Marcus got into a confrontation with someone Eina did not know. Marcus and appellant were "yelling out gang signs." According to Eina, the man that appellant and Marcus fought was yelling, "Sureno." Eina and Rendon went to the car and picked up appellant and Marcus. They then drove to Lisa's parents' house because appellant and Marcus wanted to talk to Rolando. When they arrived at Lisa's parents house, appellant and Marcus, who were "mad and upset" at the person they had confronted at the club, got out; Eina and Rendon stayed in the car. Lisa's parents asked them to leave. Eina and Rendon left; appellant, Marcus, and Rolando left in Rolando's white Cadillac.

Rendon and Eina followed Rolando's vehicle to a house in Silver City. Eina remembers seeing Castillo in Silver City but does not remember how he got there. In Silver City, there was a confrontation between Marcus and Castillo. Rolando, appellant, and Marcus were arguing with Castillo. After they left Silver City, the two vehicles went to the Hideaway to pick up Garcia. By this time, it was 2:00 a.m. and the Hideaway was closed. Garcia got into the back seat of Rolando's vehicle; appellant was driving. When Rolando's vehicle got close to Eina's house, it stopped and the men told Eina and Rendon to go home. Rendon was angry that the men were leaving them.

About thirty minutes later, appellant, Marcos, Rolando, and Castillo came back; Garcia was not with them. Appellant and Marcus had blood on their clothing. Eina saw that Rolando had a wallet. The wallet had $20 in it. Rendon put the bloody clothing in the washing machine. Marcus and appellant said that they had beaten Garcia with their fists. Marcus asked Eina to check on Garcia and take him to the hospital. Rendon and

8

Eina went to the Magic Industries parking lot to look for Garcia's body but did not see anything. They drove back to the house and reported that they could not find Garcia. Appellant got into the car and at the Magic Industries site, pointed to the area where Garcia's body should be. Instead of checking on Garcia at that time, appellant instructed the women to take him back to Eina's house. After doing so, appellant instructed Eina and Rendon to go back and take Garcia to a hospital. When Eina and Rendon returned, Garcia was lying face down with a lot of blood under his face. Garcia did not respond, and Eina thought he was not breathing.

Eina told Rendon to call 911. After calling 911, they left. The women saw the ambulance arrive as they were leaving. When they returned to the house, they told the men they had called 911. The men told them to "not say nothing." Eina saw the men building a fire in the barbeque pit but did not inquire as to what they were doing because she did not want to know.

Eina said that when she was questioned by the police, she said she had received an anonymous call about Garcia's body. She lied because she was afraid of Marcus and his friends. Eina did not permit the police to search her house because she was protecting Marcus.

The next day, appellant, Marcus, and Castillo asked her to take them to Rolando's house. Eina said that appellant and Marcus were going to leave town, along with Rolando. Marcus said they were leaving town because "of what they did." Appellant, Marcus, and Rolando left in Rolando's white Cadillac. Marcus called her several times and asked if she had talked to law enforcement. At some point, Eina permitted the police to search her house and garage. The police found a burned cell

9

phone in the barbeque pit and found shoes in the washing machine.

On cross-examination, Eina said that Marcus, appellant, and Rolando had suggested that she check on Garcia and take him to the hospital.

## 8. Alice Avalos

Alice Avalos testified that she is Rolando's aunt. In August 2009, Rolando, appellant, and Marcus drove to her house in Corpus Christi in Rolando's white Cadillac. Avalos testified that after a few days, she knew something was wrong. Marcus was nervous. Marcus and Rolando offered to sell her a watch for twenty dollars and Marcus tried to sell her a diamond necklace for twenty dollars. During the time the men were there, Avalos went to the grocery store with her friend, Connie Cuellar. Cuellar bought five bottles of hydrogen peroxide for Rolando. At some point, the men were going to leave in a van with appellant's brother.

## 9. Rolando Pena Jr.[4]

Rolando testified that he is associated with the Mexican Mafia. Appellant, Castillo, and Marcus were also associated with the Mexican Mafia. Rolando stated that appellant was previously a member of another street gang, the North Side Klan. Rolando testified that appellant and Rendon, Marcus and Eina, and Castillo attended the quinceanera at the Club Westerner. Garcia, whom Rolando had known since middle school, was also at the quinceanera.

After the party ended, Rolando and Lisa went to the home of Lisa's parents, where an after-party was planned. Castillo and his wife, Jessica, also came to the house. Sometime later, appellant, Rendon, Marcus, and Eina arrived at the house.

---

[4] The record shows that Rolando Pena had a pending indictment concerning the events leading to Garcia's death. Rolando had a plea agreement with the State to plead guilty to Garcia's murder and provide truthful testimony in this case in exchange for a sentence recommendation of forty years.

Appellant and Marcus got out and told Rolando that they had gotten into a fight at a club because Garcia had introduced them to Andy (Higdon) and Marcus did not like Andy and started a fight. Rolando said that appellant and Marcus were still "hyped up" and wanted to fight Andy and those he hung around with, known as the South Side Locos.

Appellant, Marcus, Castillo, and Rolando left in Rolando's vehicle. The men drove to Silver City where they attempted to obtain some guns from someone known as "Juanito." Rolando said they intended to look for members of the South Side Locos. Rolando explained that they felt that the South Side Locos had "disrespected" appellant and Marcus by fighting at the club. While there, an argument broke out, and appellant, Marcus, and Rolando hit Castillo. The four men then left the Silver City area. Rolando got a phone call from Garcia, who wanted a ride home from La Caliente. The men told him to meet them at the Hideaway, a nearby club. The men noticed that Eina was following them in her vehicle; appellant got out and told them to go home.

At the Hideaway, they picked Garcia up and he got in the middle of the back seat. They asked Garcia what had happened to "Lunatic" (Higdon) after the earlier fight. Garcia said that "Lunatic" had been hit by a bottle and was going to the hospital. They asked Garcia for Higdon's address and phone number; when Garcia said he did not know, they assumed he was lying to protect Higdon. Marcus and Castillo, who were in the back seat with Garcia, began to punch Garcia. Garcia said he was not lying and asked Rolando if he was going to "let this go down." Garcia was being beaten repeatedly by Marcus and Castillo. Garcia tried unsuccessfully to get out of the vehicle. Rolando told appellant to pull over. When Rolando got out, he intended to hit Garcia, but when he saw Garcia was covered in blood, he "just yanked him out of there, so we

11

could go." Garcia fell out of the car on all fours. The other three men got out. Castillo was near Garcia's feet; appellant and Marcus were near Garcia's head. Appellant and Marcus started hitting and punching Garcia; Rolando stood by. Rolando said he had intended to hit Garcia when they stopped the car, but when he saw all the blood, he changed his mind. Castillo also stood by while appellant and Marcus hit and kicked Garcia in the face and upper body area with their hands and feet. Garcia was not talking, but was moaning from the pain. Rolando did not see anyone take Garcia's necklace, watch, or wallet. The beating took place in the parking lot of Magic Industries. Marcus said that he tried to get Garcia's boots off, but could not. Garcia's body was at the rear of the vehicle when they got back in. Appellant said he was going to run over Garcia's body, but Rolando told him not to because he would get "stuff under the car" and they would not be able to clean it up. Rolando said that Garcia's condition appeared to be "major" and that he appeared to need medical attention. The men drove to Eina's house. Rolando said he talked about calling 911 but did not do so because he did not want to be caught.

When they got to Eina's house, they washed the blood off, and appellant and Marcus changed clothes. Rolando stated there was a lot of blood in the car. Appellant and Marcus told Eina and Rendon to go check on Garcia. They came back and appellant went with them to show them the location of the body. One of the women called 911. When asked if running over a person with a vehicle posed a danger of killing that person, Rolando said, "[y]es." When Rolando last saw Garcia, he believed Garcia was "pretty bad hurt" and "needed some help fast" or he "wasn't going to make it." He clarified that Garcia's condition "looked like he would die if he didn't get

12

immediate help."  Rolando stated that appellant later bragged about his hands being deadly weapons.

When Rendon and Eina returned to the house, they ate some tacos.  Castillo had left.  Rolando stated that from the time they left Garcia in the parking lot to the time that Rendon and Eina returned to the house, thirty minutes or more had elapsed.  While they were eating, no one talked about Garcia.  While the women were looking for Garcia's body, Rolando, appellant, and Marcus wiped the blood out of the inside of the car with wet towels.  While at Eina's house, Marcus showed them Garcia's wallet, which contained about twenty dollars.  At some point, appellant told him that they had burned Garcia's cell phone, wallet, and cap in a barbeque pit at Eina's house.  Castillo's wife picked him up at Eina's house.  Rolando's wife, Lisa, picked Rolando up.  When he got home, Rolando cleaned the car again with a towel.  When Lisa asked him what was going on, he told her it was none of her business.

The next day, Rolando received a phone call from "J.P.", one of Garcia's cousins, inquiring about Garcia.  Rolando told him he did not know what happened to Garcia.  The morning after Garcia's death, appellant, Marcus, and Rolando met at Rolando's house so they could all go to Corpus Christi to Rolando's aunt's house.  When they arrived at the house in Corpus Christi, they parked the car in the back to hide it.  The men were in Corpus Christi for six days before they were picked up there.  While in Corpus Christi, they cleaned the car several more times with water and towels and hydrogen peroxide.  They also removed the seat belts and floor mats from the vehicle and threw them away.  They believed that they had completely cleaned the vehicle.  While in Corpus Christi, Marcus told them he had taken Garcia's jewelry and had tried

13

to take his boots. They tried to sell the jewelry to Rolando's aunt, but she did not want it. On the day they were arrested in Corpus Christi, appellant's brother had come to pick him up in a mini-van. The three men got into the mini-van because they were trying to get to Mexico through Laredo. As they were traveling out of Corpus Christi, they were surrounded by law enforcement officers and arrested.

Rolando stated that appellant was the last one to kick Garcia and that Garcia gave "an ugly moan." According to Rolando, "that's what hurt him right there real bad." Rolando said the blow sounded different from the other blows. Rolando testified that appellant said that if Garcia was dead, he would "take the rap" for it.

On cross-examination, appellant's counsel attempted to impeach Rolando's credibility by pointing out discrepancies between Rolando's earlier statement to the police and his trial testimony. Rolando testified that he did not see appellant take anything from Garcia or order anyone else to take Garcia's property. Rolando stated that he is pleading guilty to murder even though he did not intentionally or knowingly kill Garcia. Rolando testified that there was not a formal plan to kill Garcia. Rolando stated that Castillo and Marcus, who were in the back seat with Garcia, initiated the "punishment" for Garcia's failure to provide information about Higdon. Rolando stated that they did not plan to kidnap, rob, or murder Garcia.

On re-direct examination, Rolando agreed that he intended to plead guilty to murdering Garcia because he agreed that beating and kicking a man on all fours was intentionally and knowingly killing him.

**10. Antonio Castillo Jr.[5]**

---

[5] Castillo testified that he has an agreement with the State to plead guilty to engaging in organized criminal activity or capital murder in exchange for a sentencing recommendation of twenty

14

Antonio Castillo's testimony regarding the events did not differ significantly from Rolando's testimony. Castillo testified that he "made a stupid decision to go along with these guys." Castillo said that Garcia was beaten up in the back seat because he did not participate in the fight at La Caliente. He said Marcus was yelling, "'He didn't jump in, he didn't jump in'—You know, 'Let's fuck this dude up.'" Castillo said he "went along with them" because if he had not, he would have been next.

Castillo testified that after they stopped the car at Magic Industries and pulled Garcia out of the car, he hit Garcia a few times in the back and kicked him. Marcus was kicking and hitting Garcia in the head with his hands and feet. Appellant was hitting Garcia in the head and face. Rolando was hitting Garcia in the back with his hands and feet. He stated that appellant and Marcus kicked and hit Garcia the most in the head and face. When they left Garcia, he was not talking or moving. According to Castillo, appellant and Marcus were "putting their whole body into it" "with full force, kicks and punches." At some point, Castillo and Rolando stopped hitting and punching Garcia, but appellant and Marcus did not stop.

Castillo was asked by the prosecutor, "If you were kicking someone in the head, as hard as you could, they're already senseless or semi-conscious or non-responsive, would it be your intent to harm or would you be kicking to kill?" Castillo responded, "I guess you could say, to kill the person." He also stated that as hard as appellant and Marcus were kicking Garcia, "it was like they were going to kill him." As they got back into the car, Castillo saw appellant searching through Garcia's pockets. When they left Garcia, he was unconscious.

After they got back into the car, they went to Eina's house. Castillo's wife picked

years.

15

him up shortly thereafter. Castillo stated that appellant, Marcus, and Rolando had sent him signals to keep his mouth shut. Castillo testified that at one point, appellant and Marcus had asked him if he was "talking" and said that if he testified, "you know what it is." Castillo took the comment to mean that they "were going to come after [him]" if he testified against them.

On cross-examination by appellant's counsel, Castillo admitted that no one ever said, "Let's kill Jason Garcia."

## II.    Sufficiency of Evidence

By his sole issue, appellant contends that the evidence is insufficient to support his conviction because: (1) the State failed to prove that he had the specific intent to cause Garcia's death; and (2) Garcia's death was caused by intervening circumstances, not appellant's specific acts or omissions.[6] With respect to the first argument, other than citing to general authority that the State must prove a circumstantial case, appellant's brief does not cite any authority, cite any portion of the record, or otherwise discuss his contention that the State failed to prove the intent element of capital murder. *See* Tex. R. App. P. 38.1(i). With regard to his argument that Garcia's death was caused by intervening circumstances, appellant relies on Dr. Wood's testimony that Garcia had sufficient heart disease that the trauma of the assault could have caused him to suffer a heart attack.

### A.  Standard of Review and Applicable Law

The court of criminal appeals has held that there is "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual-

---

[6] We construe appellant's second argument as a challenge to the causation element of the offense.

16

sufficiency standard" and that the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 902–03, 912 (Tex. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Accordingly, we review claims of evidentiary sufficiency under "a rigorous and proper application of the *Jackson* standard of review." *Id.* at 906–07, 912. Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see Brooks*, 323 S.W.3d at 898–99 (characterizing the *Jackson* standard as: "Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt"). The standard for reviewing a challenge to the legal sufficiency of the evidence is the same for both direct and circumstantial evidence cases. *Hernandez v. State*, 198 S.W.3d 257, 261 (Tex. App.—San Antonio 2006, pet. ref'd).

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 314 (Tex. App.—Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes

the particular offense for which the defendant was tried." *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik*, 953 S.W.2d at 240).

A person commits capital murder if he intentionally or knowingly causes the death of an individual and intentionally commits the murder in the course of committing or attempting to commit, among other things, kidnapping. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2003), § 19.03(a)(2) (West Supp. 2010); *Hernandez*, 198 S.W.3d at 261. Capital murder is a result-of-conduct oriented offense; the crime is defined in terms of one's objective to produce, or a substantial certainty of producing, a specified result, i.e., the death of the named decedent. *Roberts v. State*, 273 S.W.3d 322, 329 (Tex. Crim. App. 2008). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (West 2003). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b).

In deciding whether the defendant had the culpable mental state to commit murder, the jury weighs the evidence introduced at trial. *Childs v. State*, 21 S.W.3d 631, 635 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). A person's knowledge and intent may be inferred from the "acts, words, and conduct of the accused." *Sholars v. State*, 312 S.W.3d 694, 703 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd); *see Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). It may also be inferred from the extent of the victim's injuries, the method used to produce the injuries, and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App.

18

1995).  In a murder case, a particularly brutal or ferocious mechanism of death, inflicted on a helpless victim, can be controlling upon the issue of intent or knowledge.  *Martin v. State,* 246 S.W.3d 246, 263 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (concluding evidence of severe brain injuries was legally and factually sufficient to show intent to kill ten-month-old and support a capital murder conviction).  Intent and knowledge are fact questions for the jury, and are almost always proven through evidence of the circumstances surrounding the crime.  *Childs*, 21 S.W.3d at 635.  Intent to kill may be inferred from the use of a deadly weapon.  *Henderson v. State*, 825 S.W.2d 746, 749 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd).

"A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.  TEX. PENAL CODE ANN. § 7.01(a) (West 2003).  A person is "criminally responsible" for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.  *Id.* § 7.02(a)(2).  Evidence is sufficient to convict under the law of parties where the accused is physically present at the commission of the offense and encourages its commission by words or other agreement.  *Hernandez*, 198 S.W.3d at 261.  In determining whether an accused participated as a party, the fact finder may examine the events occurring before, during, and after the commission of the offense and may rely on actions of the accused that show an understanding and common design to commit the offense.  *Id.*  Further, circumstantial evidence may be used to prove party status.  *Id.*

Here, the jury was instructed that it could find appellant guilty of capital murder as a principal or as a party. The jury returned a general verdict; therefore, if the evidence is sufficient to support a finding under either of the allegations submitted, we must uphold the jury's verdict. *See id.*

The jury was also given an accomplice-witness instruction and instructed that Rolando and Castillo were accomplices. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005).[7] Appellant has not raised an issue challenging the sufficiency of the non-accomplice witness testimony.

## B. Discussion

As noted above, appellant does not cite any portion of the record in support of his assertion that neither he, Marcus, Rolando, or Castillo, intentionally or knowingly killed Garcia. Rolando testified that: (1) appellant and Marcus kicked and beat Garcia repeatedly in the face, head, and upper body area with their hands and feet; (2) Garcia looked like he would die if he did not get immediate help; (3) appellant wanted to run over Garcia's body with the car, but Rolando did not want to get Garcia's DNA underneath the car; (4) none of the men called 911, and Garcia was left unresponsive in the parking lot for at least thirty minutes before Rendon and Eina called 911; (5) appellant, Marcus, and Rolando cleaned Garcia's blood out of the vehicle and burned Garcia's cap, wallet, and cell phone; and (6) appellant, Marcus, and Rolando left the morning after the murder to stay in Corpus Christi and were attempting to escape to Mexico when they were apprehended. Castillo testified that: (1) appellant and Marcus

---

[7] Article 38.14 provides that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005).

20

kicked Garcia the most in the head and face; (2) if a person continues to kick in the head someone who is already senseless and non-responsive (as appellant and Marcus did), the intent is to kill; and (3) Marcus and appellant were kicking Garcia so hard that "it was like they were going to kill him." Castillo also testified that before Garcia was pulled out of the car, Marcus was yelling, "[l]et's fuck this dude up."

Although the jury was required to corroborate the accomplice-witness testimony of Rolando and Castillo, *see* TEX. CODE CRIM. PROC. ANN. art. 38.14, there was sufficient other evidence tending to connect appellant to the offense. "'[P]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction.'" *Smith v. State*, 332 S.W.3d 425, 443 (Tex. Crim. App. 2011) (quoting *Richardson v. State*, 879 S.W.2d 874, 880 (Tex. Crim. App. (1993)). Moreover, a defendant's behavior or actions prior to or following an offense may tend to connect the defendant with the commission of the offense. *Id.* at 445. Here, Eina and Rendon testified that: (1) Marcus and appellant said they had beaten Garcia with their fists; (2) the men burned Garcia's belongings in a barbeque pit at Eina's; and (3) appellant, Marcus, and Rolando left town the next morning because of "what they did." This was sufficient to tend to connect appellant to the commission of the offense. A jury may infer intent from any facts that tend to prove its existence, such as the acts, words, and conduct of the defendant. *Sholars*, 312 S.W.3d at 703. The jury was free to infer that appellant intended to kill Garcia when he and Marcus continued to kick and beat him in the head and face after Garcia was semi-conscious and unresponsive and when appellant wanted to run over Garcia's body with

21

the vehicle. We conclude that the evidence is legally sufficient to support the jury's finding that appellant intentionally or knowingly killed Garcia.

Secondly, appellant argues the evidence is insufficient because Garcia's death was caused by intervening circumstances. We construe appellant's argument as a challenge to the causation element of the offense. Appellant relies on Dr. Wood's testimony that (1) Garcia was obese and had moderate heart disease, (2) had cocaine and marihuana in his system, and (3) the injuries sustained by Garcia were not so severe that anyone sustaining the injuries would necessarily have died. We find appellant's argument to be without merit. Dr. Wood also testified that although the trauma of the assault could have caused Garcia to suffer a heart attack, "it's still the blunt force injuries he sustained, even if he had a heart attack, that would be his cause of death." She testified that the injuries sustained by Garcia could cause death in a healthy person without heart disease, and that in this case, Garcia's "injuries did cause his death or at least contributed to his death." It was the jury's role to reconcile conflicts, contradictions, and inconsistencies in the evidence, and to judge the credibility of witnesses. *See Brooks*, 323 S.W.3d at 900; *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008). We afford almost complete deference to these determinations. *See Lancon v. State*, 253 S.W.3d 699, 704–05 (Tex. Crim. App. 2008). We conclude that the evidence was legally sufficient to support the causation element of the offense.

Viewing all of the evidence in the light most favorable to the verdict, we conclude that the evidence is legally sufficient for a rational jury to find beyond a reasonable doubt that appellant intentionally or knowingly killed Garcia and intentionally committed the murder in the course of committing kidnapping. *See Jackson*, 443 U.S. at 318-18;

22

*Brooks*, 323 S.W.3d at 895. Viewing all of the evidence in the light most favorable to the verdict, we also conclude that the evidence is legally sufficient for a rational jury to find beyond a reasonable doubt that appellant, acting as a party, intentionally or knowingly caused Garcia's death. *See Jackson*, 443 U.S. at 318-18; *Brooks*, 323 S.W.3d at 895. Thus, the evidence was legally sufficient to support appellant's conviction. We overrule his sole issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS GARZA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
31st day of August, 2011.

23